Our first case of the morning is number 24-11230 and 24-13317 Sheriff of Broward County v. Evanston Insurance Company. You may begin. It pleased the court. Sam Spinner with for the appellant Evanston Insurance Company. For over 40 years this court and others applying Florida law have invariably held that a multiple victim shooting event results in multiple separate occurrences under an insurance policy as a matter of law. That precedent should have compelled the same result in this case. Instead, the district court erred by misinterpreting the Florida Supreme Court's COICOS opinion as one decided principally on the basis of ambiguity. And even if this court agrees with the district court's interpretation of COICOS, the district court still erred because it should not have granted BSO the benefit of given its sophistication and active negotiation of this policy. And for these reasons this court should reverse. Let's start with the the first principle. So forget the bottom line of COICOS for the second. Do you agree with me that COICOS found that the term occurrences was ambiguous as applied to a multiple shooter situation? No, Your Honor. Our position is that COICOS determined that these were separate occurrences, but later in the opinion it was addressing a separate argument where the insured said that all these occurrences should be related together as one. And that is when the Florida Supreme Court said, no, we're not going to give you the benefit of this aggregate or related occurrence language. And they reached that result by pointing to a case from the Southern District of New York in which the policy had that language. And so they told the insurance company, they said, look travelers, you could have included this similar language in your policy and had you done it, separate occurrences would be aggregated into one. Here's the end of the opinion. So the opinion as I understand it is broken up into two parts. The first is dealing with what is the accident? What is the nature of the accident? Is it the effect or is it the cause? And they determine it's the cause, not the effect. And then they decide what's the, there's lots of causes. Is it the proximate cause, the underlying, or is it the immediate cause? They say the immediate cause. And then they turn to the question of how does that apply in a multiple shooter situation because the immediate cause is multiple shots. And here in my, my view is the critical part of the opinion. And tell me if I'm misreading it or if I'm not understanding something. Quote, the policy's definition of occurrence as applied to the facts of this case, and the definition I think we all agree is the same, is susceptible to more than one reasonable interpretation. Occurrence can reasonably be stated to refer to the entire shooting spree or to each separate shot that resulted in a separate injury to a separate victim. Accordingly, we construe the term occurrence in Traveler's Policy in favor of the insured. Now, the, the who is in favor of is the second part, so I'm going to put that aside. But everything else seems to indicate that that reading occurrence in this context as ambiguous, right? We disagree, Your Honor. And in fact, we're not. I just read, that's a quote. How, what, what am I missing? We disagree that that was the principal holding of the COICOS decision. It may not be the principal holding, but there are, in my opinion, I, I sort of laid it out for you, but it seems to me there are three separate holdings. The first question is, do we look at effect or do we look at cause? And initially they say, we look at cause. Then the second question is, there are many causes. Do we look at the underlying tort as the cause or do we look at the immediate impact or the effect? The immediate cause is the cause. They say, no, you look at the immediate cause. It's not the negligent security, it's the bullet coming out of the gun that's the cause. And then they have to answer, as to this case where there are multiple shots fired, what does occurrence mean? And that is where that comes. So it may not be the principal holding, but isn't that a holding? It is, Your Honor, but that statement was specifically with regard to pointing to another decision that had aggregated occurrence type language. Whether they relied on some decision or not, if it is a holding, then aren't we as a diversity court under Erie bound by that holding? Yes, Your Honor, but that holding does not compel that there's separate occurrences here. And in fact, this argument has been raised to this court numerous times and this court has never found that COICOS was based on ambiguity. We'll get to Gidioni in a second, but before we get to Gidioni, which is the only published opinion that you point to for that, what you've just said. Correct. We have two other Florida Supreme Court, two other Florida decisions that seem to indicate that occurrence is ambiguous. The first one, and I agree with you, this is not necessarily holding, but in Taurus, in describing and distinguishing COICOS, the court there said, after going through the sort of history, we answer the question, the affirmative, holding. This is them, the Florida Supreme Court describing its own holding. Holding that the policy's definition of occurrence as applied to the facts of this case is susceptible to more than one Because the term occurrence was ambiguous, we construed it in the insured's favor. If a court is telling us what its holding is, how can we as an Erie court say, no, no, no, you didn't really hold that? Well, as Your Honor mentioned at the outset of the question, that statement was not the holding of Taurus. I agree with you, it wasn't. It is DICTA commenting on a prior opinion by a different composition of the court. I know, but in the diversity context, we have to look at any scrap of evidence, we've said that, any scrap of evidence we have to determine how a diversity court is going to come out. And if even in DICTA, the Florida Supreme Court is describing its own prior decision as holding X, then how do we say it's not X? Your Honor, for the same reasons, this court has never found that Taurus compelled a different result. It didn't find that in Lamberti. It didn't find that in State National. And you mentioned the Gidioni case, which is, as Your Honor mentioned, the only binding precedent on this issue, and it's also the only case that the district court did not cite in the relevant order. So let's talk about Gidioni. First of all, Gidioni predates Taurus and Maddox. I didn't get to Maddox, but it predates both of those. I'll even put that aside for the moment. Gidioni, what Gidioni says is this, the Florida Supreme Court in Coicas held that each separate pull of the trigger during the same shooting spree is an event sufficiently separated in time and space to constitute an independent occurrence. Now, that's clearly DICTA in that case, because that case is dealing with a sexual assault exclusion and facts very, very different. But again, we'll take it as it is. That is true as it goes. In other words, that is the true bottom line holding there. But that doesn't say anything about what we're talking about is whether occurrence is ambiguous or not. All we said in Gidioni is the bottom line is the Florida Supreme Court ultimately held after going through all these three things and after applying the contra preferatum and the presumptions that here was our bottom line holding in the case, or our conclusion. But it doesn't say anything about whether occurrence was ambiguous. These other cases did, though. So what do we make of that? Your Honor, we should make of that the fact that this court considered similar arguments and declined to read Coicas on that ground. And the fact that we're having this discussion and that this court's opinions arguably conflict, and we've got Torres with some DICTA and Maddox with arguably a clarity of opinion, this is all why we believe that this is an appropriate case to certify to the Florida Supreme Court to get the clarity that the court is asking for. Because I think at a minimum, we can agree that there's a reasonable difference of opinion based on this. Were any of the prior Florida cases involving excess policies or were they all first coverage policies? The Florida cases? As in the... Yes, Your Honor. The Florida cases were not excess policies, which is... Every case we had so far is a first tier case, not an excess, correct? Correct, Your Honor. Because what is fascinating to me here is that the difference, whether it's excess versus underlying coverage, makes a difference. Because here, the insured wants it to be one way, a single occurrence, whereas in most cases, if you're arguing about the underlying, you're going to want it to be multiple, which they don't here. And I always thought, and I don't know about Florida law, because I didn't see any cases you cited for this proposition, either side, that talked about... I actually think they held it was ambiguous. I think they actually said, I'm not so sure you get very far with this sophisticated argument, either, that they're entitled to the benefit in their favor. What troubles me is, I don't understand how it can be, just because a party makes an argument, in their favor is this, whereas they make some other argument, it's in their favor that. But you don't seem to really tackle that. We do argue. Do you do that in your brief? I looked at it again this morning. We do argue that BSO should not be able to just pick and choose whichever definition of occurrence suits it in a particular... It's not a definition of... Interpretation, rather. ...suits it. It's more of, yes, it's ambiguous. We get the benefit of it. But can you have multiple insured say, well, the benefit to me here under these facts is one occurrence, because it's excess. So, would you say that there's no Florida case in point with regard to how this works with an excess policy? Not that the parties have cited. Okay. But I do think it's important, in the brief time I've left in direct, is that the fact that this is an excess policy, and that we have all these unfulfilled contingencies that need to be fulfilled before coverage obligation can be current, is why we raise the jurisdictional argument in this case. Because we have a case for BSO... Let me tell you the problem with that. They say they've already spent over $500,000 in claims expenses and attorney's fees, which seem reasonable, and you don't seem to dispute that. Did you dispute that? We don't dispute the claim expenses. We dispute that they've exhausted the deductible that must be exhausted before they can claim an ultimate net loss reimbursement from Evanston, which may very well never occur. We know that they didn't exhaust the deductible for this year, based on the very claim ledger that they provided us. We know that BSO has not incurred an underlying judgment or settlement for which it can seek indemnity. And it's not an inevitability that BSO is going to be found liable in these underlying cases. And so, the only difference... The status quo of the parties is the same as it was before suit. The only thing that the final judgment does is give BSO an opinion that it can hold over Evanston at a later date, if it eventually makes a claim for insurance coverage, which it may very well never get. Well, sometimes that's actually what happens in DAC actions. That's the whole purpose of a DAC action, is to know before you go and pay a claim, are you going to have coverage or not for X, Y, and Z. So, I don't know about that. But let me go back to the excess policy aspect of it, is that it seems to me, and I actually looked for Florida law, but I couldn't find it, that Florida law would be, OK, it's ambiguous, you construe it in favor of the insured, but you do that to give the broadest possible coverage, which would mean there's got to be multiple. I mean, a single occurrence construction is never going to be in favor of the insured, except in this excess. Yeah, not in the underlying. It's never going to be in favor. And so, it just doesn't... It seems like manipulation. But I couldn't find some kind of Florida law that said when you construe it in favor of the insured, it should always be the broadest possible coverage, because that's what we're doing here. We're construing an underlying policy, basically. Correct, Your Honor. OK. Before you sit down, I have a question for you. If we were to accept your argument that each single gunshot is a separate occurrence, what about the plaintiffs who are alleging psychological harm? Did we look at the entire shooting incident, which is what cards the harm, and if so, would we have a different rule for people who got shot versus people who suffered other types of injuries? Perhaps, Your Honor. But to be clear, we've always argued and we've been consistent in our position that we're arguing that they have to exhaust one SIR per victim who filed suit. If you look at the definition of claim expenses, it talks about expenses incurred in an underlying suit. So, we're more concerned with making sure that each lawsuit has the sufficient amount of claim expenses to exhaust the SIR. The second point, Your Honor, is that under Florida law, you have to be impacted by the tortfeasor in order to make a claim for emotional injury. And so, any witnesses who were not physically impacted, my understanding is that they do not have a claim under Florida law for purely emotional injuries, which is exactly why there are 60 lawsuits and not the entire school filing lawsuits against BSO. So we don't believe those claims will ultimately survive in the underlying case. But if they do, we maintain our position that there must be one SIR exhausted for each lawsuit that was filed, not one SIR for each gunshot, which would make more sense in this case. Well, and what's the authority for that? Because a case like Coyco's doesn't support that position. It's much different. Right. And perhaps the difference is, as Judge Hull noted, the difference when we're talking about how much coverage you get in an underlying case versus what you have to exhaust. We're not saying you have to exhaust $500,000 for each shot. We've always said it's for each suit. The district court considered it that way. But you said it's for each victim. Is that what you mean by each? Right. Each victim who filed a lawsuit. Throughout, you've been saying each victim. Yeah. Each victim who filed a suit. And that is what BSO requested is, in its DEC action, was a determination that there's multiple occurrences, not how many, not how we're going to divvy it up. And like this court said in Lamberti, we only have to decide if there's one or more. It's really for further proceedings to determine how that's going to apply. And so, if your honors have no more questions, I'll save the rest of my time for rebuttal. I'll give you your full five minutes back. I appreciate that, Honor. Thank you. Good morning. May it please the Court. My name is Alexis Fields and I'm here on behalf of the Sheriff of Broward County. Even within this case, everybody, the parties, the courts, we describe this tragedy in the singular. And this is consistent with how we view tragedies. We don't have plural Boston massacres. We have the Boston massacre. We have the Parkland shooting incident. And this isn't just a matter of semantics. I bring this up in light of the Florida Supreme Court case Barnett, where they noted that the phrase, same incident or occurrence, is most reasonably understood as referring to criminal, more broadly, injury-causing event as a whole, not to the smaller segments. Yeah, but the court in those cases, in Barnett and the companion case, were very specific to distinguish the insurance context from this. I'm just not sure you can rely on the sovereign immunity laws in order to be able to shoehorn what that would be here. I think what you really need to do, in my view, I mean, use your time however you want, but I think you need to address Judge Hull's question, which is, let's get past the ambiguity point. Let's assume we agree with you and with the district court that occurrence is ambiguous. Then we get to how do we read this in favor? And I think what Judge Hull, I am loathe to speak for her, but I think what she's asking is if the rule is that we do in favor of the insured in order to expand coverage, wouldn't expanding coverage require the self-insurer, the sheriff, to cover each incident on its own before it gets to the spillover excess policy? I think that's what Judge Hull is asking, and what is your position on Florida law on that? You said it better than me. Well, Your Honor, I mean, I don't think that the self-insured is considered part of the insurer. Why? I have to say, why would that be? If you, I mean, the policy itself identifies the sheriff as the self-insured. I mean, the provision we're talking about here is the, what's the self-insured recovery or the self-insured, what's the R in that, in the SIR? Retention. Retention, thank you. I mean, it is a self-insured. So why, if we're doing it in favor of coverage, which is what I understand Florida law to be, not in favor of the sophisticated party, as your opposing counsel said, but in favor of expanded coverage, why would expanding the coverage for the first party, reading it that way, not be consistent with Florida law? Well, in order to get to the point where you make the SIR coverage or the self-retention part of the insurer, that means that you would have to disregard the fact that there is an actual insurance carrier for the excess amount and you are limiting the excess carrier policy. And I don't think that that's, I mean, it's internally inconsistent. Let me give you this hypothetical.  Forget self-insured. Imagine there were two policies, one in which there was a primary or first party carrier and one in which there was an excess carrier. And the policy there said, instead of the SIR policy said, the primary carrier is responsible for every occurrence up to $500,000 and then the excess policy comes in. How would we interpret that if this were, if you didn't represent the sheriff, but instead represented the first party carrier? Hypothetical. I would still say that the excess, this court should find under Florida law that the excess carrier coverage should be interpreted to provide the most. Why? So we, again, getting past ambiguity and then looking at the presumptions, how does that presumption fit in where the presumption is not in favor of the insured, since both sides are insured in that one, and in favor of coverage, there really is, it's sort of half one, you know, a dozen one or half dozen one, six in the other, because they both are providing coverage and you think the primary would be the one most responsible for coverage, right? No, Your Honor. Why? I would disagree. I would say, I mean, this is, they've taken out a policy, so they're not primarily responsible. They're up to a certain point, just like a deductible. There's a separate deductible. This is the self-insured portion. Yes. You told me to forget that, but I understand. There is a separate deductible that they need to satisfy amongst themselves. Once they've done that, then the separate policy, which is how it seems that we're interpreting this, also needs to be interpreted to provide the broadest coverage in favor of the insured, which is still BSO. Whether BSO's insuring itself or if it's insured by Evanston, it is the insured, and so the policy should favor broad coverage and in favor of the insured. I would also point out the case Shiloh, that in that case, this court has, and that is a published opinion, where this court has acknowledged that Florida law favors that, and that was subsequent to, you said Gideoni. I've been saying Gideoni this whole time, so I hope I haven't. I'm sure you're right, and I'm not. So I think that's important. But even if we were to disregard the prevailing, consistent, repeatedly-emphasized policy in Florida to find in favor of broad coverage in favor of the insured and against the insurer, even accepting the cause theory solely as to that, let's forget about the ambiguity, even though I think everybody agrees it's ambiguous, COICOS is very different in its cause theory analysis because of the facts there, where the individual bullets, the two individual, individuals was not separate in time or space for determining that cause. Let's go back to Shiloh. Yes, Judge. So, I mean, this is in my, this gets to what I think is the heart of Judge Hull's question because here's what we said in Shiloh, which I think is a fair statement of Florida law. Quote, Florida law is clear that when an insurance policy is facially ambiguous, so we got that, the ambiguity is resolved in favor of coverage and against the insurer. But if there's a self-insurer that's responsible for some portion of this, they are an insurer and coverage would include them just as it would include the excess. And so I'm just, I'm wondering how that statement of Florida law, which I think is exactly what Judge Hull is asking, fits into this. And I also have not seen it where we have primary and excess on one side of the V and the other side of the V. I think that to ignore the fact that the court is, the Florida courts require a determination of broad coverage is to ignore the separate policy and it would be internally inconsistent. I think that Shiloh... You mean ignore the separate excess policy? To treat the excess policy as two policies, I think would be internally inconsistent and it would... Two policies. What are the two policies you're talking about? The BSO self-insurance versus the carrier. I'm just not buying it because you're saying to treat the excess itself as two policies. That's not what you're saying. You're saying to treat... I think it should not be treated that way. I apologize, Judge. Okay. All right. So you're just saying we should ignore the underlying policy. Is that what you're saying? No. Not at all. I think...  All right. I'm confused. I think that the underlying policy should not be treated like two separate policies. So there isn't a insurer, BSO insuring itself and also Evanston as the insurer separately. Or it should not be treated as a policy at all. It should be treated as a policy. It should be treated as one policy. The underlying policy. Let me see if I can clarify here. So I think what I hear you saying is the SIR provision really isn't a separate insurance, which is what I've been questioning you about. It is instead just another exclusion that's written into an excess policy. That is a much better... You said it much better than I did. So is that really what you're arguing to us? That the insurance policy is the excess coverage. Right. I get that.  But I mean, what you're saying is we should treat the SIR not as a primary insurer, a first-party insurer, or self-insurance, but really just another exclusion that carves out a certain amount of money before coverage kicks in. Yes, Your Honor. I will say that is sort of inherently inconsistent with the concept of an excess policy. I mean, I think that's what I understood Judge Hull to be asking your brother on the other side, which is the concept of excess policy is it pours over after coverage stops on something else. That's the nature of excess. And so if we agree it's an excess policy, and I think we have to agree to that, right? Yes, Your Honor. Then that means it's excess to something, and the something seems to indicate that it's some level of self-insurance by the sheriff for some amount at the beginning. And so that does look like we're talking about two separate policies here. But there is no policy for, because it is self, there is no policy to be construed between BSO and BSO. So there is no room for this court under Florida law to interpret the self-retention as a separate policy or to, you know, there's no interpretation of it. So how can it be construed? And you would say that excess is excess over the first-level insurer? I would say excess is over the amount that first qualifies you for the insurance policy coverage that we're here on, which is the excess policy. Would you say if you have a large retention like they have here, you'd have one result, but yet if you had an underlying actual policy without a retention, a two-layer deal, there would be a different result? Is that what you're arguing? If you had a, I think, if there were two policies, both policies would need to be construed under Florida law. Here there is only one. So I can't hypothetically tell you. I know, but I'm asking, would you say the result would be different with regard to how you construe the excess policy if you had one where there was a retention of $500,000 as opposed to a primary coverage for $500,000? You say there'd be different results, or you're saying they could be the same result? I don't think there'd be different results. I just think that they would both be independently construed in accordance with Florida law.  So is, am I correct, there doesn't seem to be a case under Florida law analyzing these types of issues with excess policy? There's nothing like this so far. Well, Your Honor, I would say that... Where there's an excess policy. Tell me one that had an excess policy. I would say, Your Honor, that Florida law does not distinguish between excess policy... That's not what I asked. I understand that. I'm just trying to see if I've got an answer in Florida law in an excess case. Has anybody cited an excess case?  There is not a Florida law case with excess, but I do think that the Florida law cases apply to excess policy. I understand. Insurance policies are insurance policies, and you just... So why shouldn't we certify this? This seems... Because you think about it. This may be good for the sheriff in this case, okay, to have it a single occurrence. But for a lot of times, it's not going to be good, okay? It's not going to help the insurance where you go, say, this is a single insurance. That's why you find all these cases, the insurance is saying it's multiple occurrences, so they get multiple... Even in excess situations, they want to have multiple excess, okay? They want to have the excess apply to every victim, not just a one-time thing. My response to that, Your Honor, would be, if the question is why shouldn't it be certified? That is a question. I think the fallback is, even under the cause theory, this case would still require a one incident determination based on the fact that they're... And COICOS specifically rejected the idea of doing it based on the number of victims or the number of people bringing the lawsuit. It was... And it had a dissent, two, three, four, three. There was a dissent, yes. Or three. Okay. But so here... Is that clear all this is? Here, because of the Parkland shooting incident, it isn't just a single bullet that is attributable that caused the harm. Here we have a bullet that could have gone... And there was also a distinction within COICOS when they cited to the 50 CA McQuaig, where they even talk about, and they distinguish multiple versus single, and they say, analogous to this would be if a single shot had injured both victims. I mean, that's something that is present here in the Parkland case, because of the AR-15 and the nature of it. There's also something here that is present in the Parkland shooting incident, because there are people who were injured who didn't even have a bullet touch them. This isn't attributable to each individual shot. That wasn't the holding of COICOS. It had to be sufficiently separate in time and space, and that is not present here. So that would be another independent reason to affirm the district court and not certify the question to the Florida Supreme Court. Thank you. Are there any other questions? I guess that's all of my presentation. Thank you so much. Thank you.   Considering the discussion today, Your Honors, this case is appropriate to certify to the Florida Supreme Court to get the answers to the court's questions. Not only do we have this unique scenario of excess and underlying self-insured retention, but we have conflicting decisions from this court, while many of them are non-binding. There is no case from this court that has ever applied COICOS based on ambiguity, and it has rejected the insured's preferred interpretation several times. This court has also projected the argument that, at least implicitly, that TOROS compels a different result, which was raised to the court in the state and national case. And in fact, we provided the district court with the briefs in that case to show that the insured had directly argued to this court that COICOS was ambiguous and that TOROS clarified this, and this court ultimately affirmed for the reasons stated in the underlying opinion in which the City of Miami District Judge correctly found that COICOS compels the result that these are multiple separate occurrences. My friend on the other side brought up the McQuaig case, and I think that's an important point here, because the Florida Supreme Court agreed with McQuaig, which found that there were separate occurrences when there were separate shots. If the Florida Supreme Court determined that this had to be an ambiguity, then it would have receded from McQuaig and RLI. It would have said these cases were wrongly decided because they determined this as a matter of law and not on the basis of ambiguity. And so the fact that the Florida Supreme Court didn't do that, it didn't reference ambiguity in the certified question response, it only referenced ambiguity with respect to this related occurrence language that BSO and the insurance company in that case could have had but didn't in the policy, just like we have in this case, where the immediate predecessor policy has a related occurrence endorsement, but now the current one does not. And that's an important point, Your Honors, because under BSO's view, that endorsement is completely superfluous. Their position is that they get to pick the number of occurrences in the first instance. They say this is one occurrence. But if this is one occurrence, then there are no separate but related occurrences to aggregate together into one. And that's why our interpretation of COICOS is that the Florida Supreme Court found that these were multiple occurrences, but they weren't going to give the insurance company the benefit of this widely known and used related occurrence language that they did not have in the policy. And to that end, that's why we've also raised the sophisticated insured exception. And we believe that if the court is unclear on the ambiguity argument, it should also certify the question of whether that exception should apply under Florida law. This is the perfect case for the court to do that because, one, BSO does not dispute its sophistication. They say in their answer brief it doesn't matter that they're sophisticated. And we have prior litigation under predecessor policies. We have the removal of an endorsement that would have changed the result in this case, and then the district court said it doesn't change the result. We have an arm's length negotiation between sophisticated parties. And CONTRAPROF is intended to remedy the David versus Goliath situation where an insured gets a standard auto or home policy. They click a couple buttons online and they get an adhesion contract. That is a far cry from what's happened in this case. This court recognized that in the recent ECV decision under New Jersey law. And several other courts have also applied this exception. So to the extent that this court is leaning towards certifying the COICOS issue, we believe it's appropriate to also include the CONTRAPROF issue. The Florida Supreme Court has certainly issued the general rule that ambiguities are construed against insurers, but it's never specifically rejected the argument that there is an exception to that common law rule. And we believe that this case is the perfect opportunity for the Florida Supreme Court to provide that clarity under Florida law. And the fact that we have all this extrinsic evidence that's directly relevant to what the parties met is emblematic of the fact that this was a negotiation between parties on an even playing field and not an adhesion policy scenario. Ultimately, Your Honor, the district court erred in its interpretation of COICOS. We believe that this court's prior opinions are correct in Lamberti and City of Miami and Guide 1. In every case that this court has ever addressed COICOS, it has found, it has ruled not based on ambiguity but based on the law. We believe that should have been done in this case. But even if this court disagrees, we believe that this should be certified on the CONTRAPROF issue as well. And so for these reasons, we'd ask that this court reverse the final judgment or alternatively certify these important issues to the Florida Supreme Court so that we can get the clarity that the court appears to be looking for based on the questions here today. Thank you for your time. Thank you, counsel.